Filed 8/28/24  Conservatorship of E.A. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Conservatorship of the Person of E.A. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>E.A.,<br><br>    Defendant and Appellant. | A169299<br><br>(Contra Costa County<br>Super. Ct. No. P20-00896) |

Since October 2020, E.A. has been under conservatorship as a person with a grave disability under the Lanterman-Petris-Short Act (Welf. & Inst. Code,[1] section 5000 et seq.; LPS Act).  In this appeal, she challenges the trial court's failure to provide a timely jury trial on a petition for renewal of her conservatorship filed in September 2022.  It was never adjudicated.

A later petition for renewal was filed in September 2023, before any trial was held on the 2022 petition.  The September 2023 petition was heard in November 2023, and E.A.'s conservatorship was extended.  We are dismayed by the trial court's inability to hear the 2022 petition for over a

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

year, involving as it does " 'a massive curtailment of liberty' " for E.A. (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 368 (*Camacho*).) However, since E.A. is unable to demonstrate that she was prejudiced by the delay, we affirm.  We direct the trial court to dismiss the September 2022 petition for conservatorship as moot.

## I.  BACKGROUND

A petition was filed in August 2020 seeking a conservatorship over E.A. on the grounds that she was gravely disabled as a result of a mental disorder and unwilling to accept, or incapable of receiving, voluntary treatment.  The petition followed a long history of her interaction with county mental health officials beginning in 2016, including 10 outpatient referrals and 8 acute inpatient hospitalizations.  Most recently, E.A. had been admitted to the regional medical center in late July 2020, a day after she was discharged from the hospital to a crisis residential program.  She left the residential program within hours of arriving and was later found wandering around a BART[2] station in her underwear.  E.A. was diagnosed with schizoaffective disorder, bipolar type, and was too disoriented and disorganized to accept treatment voluntarily.

In October 2020, E.A. accepted the appointment of a conservator.  A petition for renewal of E.A.'s conservatorship was filed on September 24, 2021.  At an October 19 hearing on the renewal petition, E.A. again accepted appointment of a conservator.

Another petition for renewal, the one involved in this appeal, was filed on September 13, 2022.  It was set for hearing on October 7, 2022.  On that date, counsel for E.A. sought to continue the hearing on the petition for 30 days.  The court continued the matter to November 18, when it was again

_____

[2] (Bay Area Rapid Transit.)

2

continued at E.A.'s request to December 2. The reason for the continuance to December was that E.A. had a visit scheduled with her family to take place on November 19, the day after the trial was set to begin.

When the matter was called on December 2, E.A. objected to the appointment of the conservator and requested a jury trial with no time waiver. The case was set for a jury trial to begin on January 3, 2023. On that date, however, there were no courtrooms available for trial, so the case was reset for January 17. When the parties appeared on January 17, the court announced it was unable to hear a jury trial that week, and the matter was continued until January 30. On January 30, assigned counsel for the petitioner was ill, and the deputy assigned to cover her appearances was not ready to proceed. E.A.'s counsel objected to any continuance, but the court found good cause to continue the matter to February 6.

On February 6, 2023, E.A. was ready to proceed to trial, but multiple cases were set for the same day. The court queried the public defender assigned to represent E.A. on whether the public defender's office could handle multiple trials on the same day. After observing that no courtrooms had been made available for the public defenders' cases that day, E.A.'s counsel replied that her office would adjust to handle the cases that were assigned. But counsel for the petitioner said she was not ready to proceed because she had prepared for other cases that had priority over E.A.'s petition.

Counsel for E.A. objected to any further continuance and moved to dismiss the petition for the court's failure to bring it to trial in a timely manner. The court found the unavailability of courtrooms and the petitioner's unreadiness for trial to be good cause for a continuance. The motion to dismiss was denied, and the case was continued to March 6.

3

On March 6, counsel for E.A. was ready to proceed. Counsel for the petitioner, however, stated she was not ready because she had just received some records pursuant to subpoena and asked for a continuance. E.A.'s counsel again objected to any continuance and moved to dismiss the petition. The court denied the motion to dismiss and found good cause to continue the case to April 10.

On April 11, the matter was continued to May 8, without objection, due to the unavailability of the court and both counsel. On May 8, both counsel appeared and stated they were ready for trial. But it appears other matters were also set for trial that day. The following colloquy ensued. The court asked counsel for the petitioner, "Can you represent that you have a second deputy available [for trial] if you were engaged in another trial?" She answered, "Yes." The court then asked counsel for E.A. about her readiness to proceed. She replied, "We've been requesting a time-not-waived jury trial since December 2nd, 2022. [¶] I believe it's a violation of due process that County Counsel continues to get the benefit of the continuance of these trials to request further records in these matters that aren't being provided until up to the date of trial. [¶] And I don't believe that there would be any good cause for continuance. So we're ready." The court asked counsel for E.A., "And can you make a representation concerning another attorney available should you be engaged in another trial?" Counsel responded, "Should the Court have an additional department available, we can provide additional staffing." Despite this assertion, the court replied, "[S]ince there's no representation about a second deputy available, I will find good cause to continue." The court denied another motion to dismiss and continued the case to July 10, 2023.

4

On July 10, there was an extended colloquy with the court about whether both parties had a right to, and had been provided with, updated clinical records pertaining to E.A.  Since it did not appear that updated records were properly subpoenaed, the court declined to make a good cause finding for a continuance based on their absence.  However, the court did find good cause for a continuance based upon the court's unavailability for trial saying, "I'm going to be engaged in another court trial, and I'm the only department available."  E.A.'s counsel objected and moved to dismiss.  Although the court recognized that her concerns were legitimate, it continued the case to July 24.  There was no express ruling on the motion to dismiss.

The case was next heard on August 28, 2023.  Both parties were ready to proceed at the morning calendar call, the jury trial was set to commence, and the case was passed until later in the day.  Later, however, counsel for E.A. informed the court that she had commenced trial in another matter and asked the court to trail E.A.'s case.  The court declined to do so, finding good cause to continue the matter to October 2, 2023.

Before the parties returned to court on October 2, a successive petition for reappointment of the conservator was filed on September 7, 2023.  This most recent petition was set for hearing on October 4, 2023.  Counsel for E.A. filed a peremptory challenge on this new filing.  The case was reassigned, and the newly filed petition was set for a jury trial on October 2, 2023.  On October 2, no courtrooms were available for an LPS Act jury trial, so the court trailed the case to Wednesday, October 4, over E.A.'s objection.

On October 4, the case was again continued over E.A.'s objection, this time to October 9, due to the unavailability of a courtroom for an LPS Act jury trial.  The case trailed on the calendar until October 11  because E.A.'s counsel was in trial on another matter.  Both counsel were ready to proceed

5

on October 11, but the expert for the petitioner was unavailable. Again, over E.A.'s objection, the court determined there was good cause to continue the case until October 16.

When the parties appeared on October 16, the court trailed the case to October 18, over E.A.'s objection, because no courtroom was available for trial. On October 18, the court again did not have a department available for trial. The case was continued to November 6, without objection.

On November 6, 2023, counsel for E.A. requested a court trial on both the 2022 and 2023 conservatorship petitions and objected to any further continuances. On November 8, the matter was continued because E.A. was ill and could not be transported to court. The case was set for November 13. On November 13, the court was informed that E.A. was under quarantine and could not be brought to court until at least November 22. The matter was continued to November 27.

When the case was called on November 27, it was trailed for one day because counsel for E.A. was ill. When the parties appeared on November 28, E.A. accepted the conservatorship renewal alleged in the September 2023 petition with a less restrictive placement that would move her from a mental health rehabilitation center to a board and care facility. The court ratified the actions of the conservator over the previous year since the filing of the 2022 petition, and on November 30, 2023, ordered the less restrictive placement. E.A. timely appealed.

On January 24, 2024, after reviewing the updated conservatorship investigation report, the court issued its order reappointing the conservator, ratified the actions of the conservator over the period of October 27, 2022 to October 26, 2023, as related to the September 2022 petition for reappointment, and designated a board and care facility as E.A.'s least

6

restrictive and most appropriate placement. Pursuant to the updated report, E.A. remained gravely disabled with little progress since her evaluation in October 2021.

## II. DISCUSSION

E.A. argues that the court erred and violated her statutory and constitutional rights to a speedy trial when it ordered repeated continuances that delayed her trial for almost a year.

This is not the first time our court has considered an appeal alleging an unwarranted delay in bringing LPS Act cases to trial in Contra Costa County in 2023. In *Conservatorship of T.B.* (2024) 99 Cal.App.5th 1361, 1370–1373 (*T.B.*), our colleagues in Division Two considered a delay of 171 days following a demand for jury trial. Here, the delay was 362 days. We agree with the thoughtful analysis and holding in *T.B.* and will apply it in this case.

The LPS Act serves important public interests of ending improper and indefinite confinement of the mentally ill, providing the mentally ill with evaluation and treatment of serious disorders, and protecting public safety. It protects the rights of involuntarily committed subjects through judicial review, individualized treatment plans, and supervision and placement of individuals through a conservatorship program. The LPS Act also protects the mentally ill from criminal victimization and the suffering attendant to their inability to care for themselves. (*T.B.*, *supra*, 99 Cal.App.5th at p. 1376.)

There is no doubt that the liberty interests at stake in an LPS Act conservatorship are also significant. A person determined to be gravely disabled under the LPS Act may be confined for a year, and have their confinement renewed annually so long as they remain disabled. In addition

7

to freedom from confinement, conservatees may also lose significant personal rights, including driving privileges, voting rights, the ability to contract, and the right to refuse or consent to medical treatment. (*T.B.*, *supra*, 99 Cal.App.5th at p. 1376.)

In light of the significant private interests at stake in LPS Act proceedings, several layers of important procedural safeguards are built into the process. There are a series of temporary detentions for evaluation and treatment that safeguard against the erroneous deprivation of liberty. (*T.B.*, *supra*, 99 Cal.App.5th at p. 1376.) Only after those temporary detentions have failed to ameliorate serious mental health issues may an individual be subject to a petition for a year-long detention due to grave disability. (*Id.* at p. 1377.)

Section 5350 provides that a court or jury trial to effectuate a year-long commitment under the LPS Act shall commence within 10 days of a demand for trial, subject to a possible continuance for 15 days if requested by counsel for the proposed conservatee. (§ 5350, subd. (d)(2).) In 2022, the statute was amended to add that failure to commence trial within the specified time is grounds for dismissal of the petition. The amendment became effective January 1, 2023. (Stats. 2022, ch. 960, § 5.)

But this 10-day deadline for commencement of trial mandated by section 5350 has been held to be directory, not mandatory (*Conservatorship of James M.* (1994) 30 Cal.App.4th 293, 299), and it remains directory even after the 2022 amendment (*T.B.*, *supra*, 99 Cal.App.5th at pp. 1382–1384). Thus, the trial court retains the discretion to determine whether a delay in bringing a case to trial may be excused, or whether the circumstances warrant dismissal of the petition. (*Id.* at pp. 1382–1384.)

8

The circumstances that may excuse delay in this context include continuances supported by a finding of good cause. (*T.B., supra*, 99 Cal.App.5th at p. 1389.) But this does not mean that "good cause" for a continuance is a mere shibboleth for the trial court to recite when it delays the commencement of a trial. A finding of good cause requires the court to consider the factors specified in rule 3.1332 of the California Rules of Court.[3]

Rule 3.1332(d) states that in considering a request for continuance, "the court must consider all the facts and circumstances that are relevant to the determination. These may include: [¶] (1) [t]he proximity of the trial date; [¶] (2) [w]hether there was any previous continuance, extension of time, or delay of trial due to any party; [¶] (3) [t]he length of the continuance requested; [¶] (4) [t]he availability of alternative means to address the problem that gave rise to the motion or application for a continuance; [¶] (5) [t]he prejudice that parties or witnesses will suffer as a result of the continuance; [¶] . . . [¶] (7) [t]he court's calendar and the impact of granting a continuance on other pending trials; (8) [w]hether trial counsel is engaged in another trial; [¶] . . . [¶] (10) [w]hether the interests of justice are best served by a continuance, by the trial of the matter, or by imposing conditions on the continuance; and [¶] (11) [a]ny other fact or circumstance relevant to the fair determination of the motion or application."

Here, a trial on the September 2022 petition was never held while E.A.'s case languished and her conservatorship continued for more than 362 days until November 28, 2023, when the court heard the September 2023 petition. The reason supporting good cause was most often the court's inability to provide a courtroom for an LPS Act jury trial. The minutes and transcripts of the many hearings reflect barely more than this conclusory

---

[3] References to rules are to the California Rules of Court.

reason supporting delay, and do not expressly reflect consideration of the factors specified in rule 3.1332(d). For example, none of the hearings reflect the number of days the case had remained pending beyond the statutory directive, or the number of continuances previously granted. Yet, by early 2023, "it should have been clear that the lack of sufficient courtrooms was a recurring obstacle to commencing trial in this case. But there is no indication that the court had looked into '[t]he availability of alternative means to address [this] problem.' (Rule 3.1332(d)(4).)" (*T.B.*, *supra*, 99 Cal.App.5th at p. 1392 [discussing the Contra Costa County Superior Court in early 2023].)

Just as in *T.B.*, there is nothing in the record to suggest the court viewed setting this case for trial with the level of urgency the statute and circumstances require. There is reason to question the sufficiency of the good cause showing under rule 3.1332 for many of the continuances granted in this case. But the absence of significant analysis for the many continuances does not compel us to reverse the order of commitment and remand for a new trial. Rather, we must still consider whether E.A. suffered prejudice due to the delay. (See *T.B.*, *supra*, 99 Cal.App.5th at p. 1392.)

Recently, in *Camacho*, *supra*, 15 Cal.5th 354, our Supreme Court addressed the appropriate constitutional framework for evaluating the timeliness of trials under the Sexually Violent Predator (SVP) Act (Welf. & Inst. Code, § 6600 et seq.).[4] In that case, the SVP trial was delayed for more than a decade. (*Camacho*, at p. 368.) In considering a due process challenge to the failure to bring the case to trial in a timely manner, the *Camacho* court—while it refined the prejudice analysis to fit the non-criminal context

---

[4] The SVP Act is a scheme of civil commitment for the treatment of sexual predators apart from any criminal sanctions they may receive. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143.)

of the case as we discuss below—otherwise applied the test articulated by the United States Supreme Court in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) that is traditionally used to analyze pretrial delay in criminal cases.

"[T]he *Barker* court declined to adopt any bright-line rules for determining when the right [to a speedy trial] has been violated.  The court instead identified four factors for courts to examine: the length of the pretrial delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant caused by the delay.  [Citation.]  The defendant carries the 'burden of demonstrating a speedy trial violation under *Barker*'s multifactor test.'  [Citation.]  Because none of these factors is dispositive, 'courts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed."  (*Camacho, supra,* 15 Cal.5th at p. 380.)

When applying the *Barker* framework in the SVP context, however, the court expressly rejected the rule applicable to criminal speedy trial claims that presumptive prejudice is part of the mix of relevant facts to be considered and that its importance increases with the length of delay. (*Camacho, supra,* 15 Cal.5th  at p. 392.)  As our high court explained:  "There is little reason . . . to apply a presumption of trial prejudice in the SVP context.  As previously noted, trial on a petition for commitment under the SVP Act aims to establish whether a person meets the definition of an SVP *at the time of trial*.  This inquiry is categorically different from that of a criminal trial, where the issue is whether the defendant's past conduct constitutes guilt of a particular offense.  In the SVP context, then, time ordinarily will not erase critical evidence for the defense, since the jury relies on recent expert evaluations to evaluate whether the individual qualifies as an SVP at the time of trial. . . . Severe prejudice to the alleged SVP's defense is less

11

likely to result purely as a function of the passage of time; as a result, no presumption of prejudice applies in this context." (*Ibid.*)

When further considering prejudice, the *Camacho* court also distinguished pretrial incarceration at a state hospital from pretrial detention at a jail, which has few rehabilitative resources. (*Camacho*, *supra*, 15 Cal.5th at p. 393.) Specifically, although it stressed "the oppressive nature of involuntary detention awaiting an SVP trial," the court acknowledged that "[p]retrial treatment of the underlying mental disorder that caused the state to seek commitment in the first place may ultimately facilitate the individual's release before trial." (*Ibid.*)

In the end, the *Camacho* court concluded that, in the SVP context, "[d]etermining how heavily to weigh the prejudice resulting from pretrial custody . . . requires a sensitive inquiry into the circumstances of the case. For individuals who have never received a favorable expert evaluation, delay in holding trial will generally entail less prejudice than for individuals who have a more substantial basis for arguing they do not satisfy the criteria for SVP commitment. Where an individual makes such a showing, the amount of prejudice may increase as the length of the delay increases. For example, in the case of an individual who has expert reports recommending release, a four-year delay in going to trial will generally be significantly more prejudicial than a one-year delay." (*Camacho*, *supra*, 15 Cal.5th at p. 393.) We find *Camacho*'s analysis in the analogous SVP context helpful and apply it here.

In assessing the first of the *Barker* factors in this case, we will assume without deciding that the delay of 362 days in bringing this case to trial weighs in support of a due process violation. (Accord, *T.B.*, *supra*, 99 Cal.App.5th at p. 1395; see also *Camacho*, *supra*, 15 Cal.5th at pp. 383,

12

390.)  But the reasons for the delay do not entirely rest with the court or the prosecution.  The case was continued at the request of E.A.'s counsel from October until December 2022, when counsel made the demand for a jury trial and declined to waive time.  There were also three later occasions when the case was continued to accommodate E.A. or her counsel.  Thus, the reasons for delay are in some part attributable to E.A.  In contrast, there is no question that from December 3, 2022, E.A. was persistent in her request for a jury trial and asserting her right to prompt adjudication.  But the fourth *Barker* factor of prejudice weighs against E.A.

In arguing that she was prejudiced, E.A. says that she "only" withdrew her demand for trial and "acquiesced" to the conservatorship due to the extended delay in getting her case to trial.  She thus implies that her agreement to extend her commitment was not voluntary.  However, there is nothing in this record to suggest that E.A.'s ability to prepare for trial or her defense to the allegations was impaired by the delay.  There is also no reason on this record to question that E.A. remained gravely disabled when she agreed to extend her conservatorship in November 2023.  The investigator's report for this most recent commitment prepared in late 2023 plainly states that her condition remained essentially unchanged since she was evaluated in October 2021.  Moreover, the agreed disposition of the September 2023 petition was announced when her trial was to begin, and she could have proceeded to trial on that day.  Finally, E.A.'s argument that the extended nature of the delay alone in this case was presumptively prejudicial was rejected by the *Camacho* court as discussed above.

In sum, E.A. has not shown that the delay in this case "had [an] appreciable impact on [her] ability to present [her] defense."  (*Camacho*, *supra*, 15 Cal.5th at p. 393; accord, *T.B.*, *supra*, 99 Cal.App.5th at p. 1396.)

13

After balancing the *Barker* factors, we conclude E.A. has not met her burden to show her due process rights were violated.

Although we have concluded that E.A. has not demonstrated she was prejudiced by the delay in this case, our holding should not be read to minimize the responsibility courts have in ensuring timely trials under the LPS Act.  An adjudicated conservatee faces a loss of personal freedom and fundamental rights, including the ability to refuse or consent to medical treatment.  (*T.B., supra*, 99 Cal.App.5th at p. 1376.)  As stated above, "[i]nvoluntary civil commitment entails 'a massive curtailment of liberty.' " (*Camacho, supra*, 15 Cal.5th at p. 368.)  " '[I]t must be remembered that " 'the primary burden' to assure that cases are brought to trial is 'on the courts and the prosecutors.' " [(Citation, quoting *Barker*, [*supra*,] 407 U.S. at p. 529.)] Furthermore, "society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest." [(*Barker,* at p. 527.)]  Thus, the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner.  [Citation.]  And to that end, it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay.' " (*People v. Williams* (2013) 58 Cal.4th 197, 251.)  " ' "The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders." ' " (*Camacho*, at p. 389.)  That is exactly what happened here.

As a final matter, we note that an LPS Act conservatorship lasts only one year as a matter of law.  (*Conservatorship of K.Y.* (2024) 100 Cal.App.5th 985, 988.)  The court's ability to rule on the September 2022 petition that

14

initiated this appeal expired on September 12, 2023.  It remains unresolved and is now moot.  We will direct the superior court to dismiss it.

### III.  DISPOSITION

The January 24, 2024 order for conservatorship is affirmed.  The case is remanded with instructions for the trial court to dismiss the petition for conservatorship filed in September 2022 as moot.

SIGGINS, J.*

WE CONCUR:

HUMES, P. J.

BANKE, J.

A169299
*Conservatorship of E.A.*

_____

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.